**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**GOODNIGHT TERMINAL SERVICES, INC., GARY MACKEY, and WILLIAM BUCKLEY** **PLAINTIFFS**

**v.** **Civil No. 1:24-cv-306-HSO-BWR**

**ASG CHEMICAL HOLDINGS, LLC A/K/A ASG CHEMIE** **DEFENDANT**

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT ASG CHEMICAL HOLDINGS, LLC'S MOTION [34] TO DISMISS**

This is the third attempt by Defendant ASG Chemical Holdings, LLC to dismiss Plaintiffs Goodnight Terminal Services, Inc., Gary Mackey, and William Buckley's claims. In the two prior attempts, the Court granted in part and denied in part ASG's requests. ASG now seeks to dismiss Plaintiffs' remaining claims in the operative Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Mot. [34]; Mem. [35]. Again, Defendant's Motion [34] should be granted in part and denied in part.

## I. BACKGROUND

This case concerns the failed business relationship between Plaintiffs Goodnight Terminal Services, Inc. ("GTS"), a Mississippi corporation that provides a number of transloading and distribution services; Gary Mackey ("Mackey"), the co-owner of GTS; William Buckley ("Buckley"), the General Manager of Bisley International, LLC ("Bisley"), a material supply company and non-party to this suit;

and Defendant ASG Chemical Holdings, LLC a/k/a ASG Chemie ("ASG" or "Defendant"), a limited liability company that provides consulting and marketing services. *See generally*, Second Am. Compl. [33] ("SAC"). According to Plaintiffs, non-party Bisley "contracted with ASG to help Bisley grow in the lithium market." *Id.* at 2. To do this, Bisley entered into a Marketing Cooperation Agreement [33-1] with ASG in November 2019. Dkt. [33-1].

Plaintiffs claim that in 2019, Jeff Koebrick, an ASG employee, contacted Mackey, the Chief Executive Officer ("CEO") of GTS, and told him that "ASG was working on behalf of an Australian company, Bisley, that needed a warehouse in the United States." SAC [33] at 3. After discussing the opportunity, "GTS entered into an agreement with Bisley for storage at [GTS's] Hancock County [Mississippi] Warehouse," laying the "foundation for GTS's business relationship with ASG/Bisley." *Id.* at 4.

About one year later, ASG allegedly approached GTS with a different proposal: "GTS and Mackey would provide all additional services required by ASG/Bisley . . . beyond those they were already performing," *id.*, and in return, "GTS and Mackey would pay a kickback in the form of 'broker fee' to ASG and [Ken] Pryde [Bisley's Operations VP]," *id.* GTS and Mackey declined the offer, but "ASG representatives continued to periodically solicit kickbacks from Plaintiffs and GTS," which they ignored. *Id.* Nonetheless, "GTS and Mackey continued to provide the pre-agreed services" for "ASG/Bisley." *Id.*

In February 2022, "Bisley and ASG entered a new, but identical, Marketing Cooperation Agreement." *Id.* at 5; *see* Doc. [33-2] (Second Marketing Cooperation Agreement). According to Plaintiffs, ASG then promised that "if Mackey opened a GTS warehouse in Houston [Texas], they [Plaintiffs GTS and Mackey] would receive *all* business that moved through ASG, including Bisley's." SAC [33] at 6 (alterations and emphasis in original). GTS and Mackey agreed to expand their operation into Texas, allegedly incurring significant costs in the process. *See id.* And in September 2022, "GTS entered into an amendment to the Warehouse Storage Agreement with Bisley to add the Houston Warehouse." *Id.* Although ASG allegedly continued to solicit "kickbacks" from "GTS and Mackey," ASG "continued to provide GTS/Mackey with business." *Id.*

Next, Plaintiffs allege that, at some unspecified time, "ASG began paying Bisley employees to act against Bisley's—and by extension, Plaintiffs'—interests." *Id.* at 8.[1] And they claim that Pryde, Bisley's Operations Vice President, was "on board by then." *Id.* Plaintiffs assert that on February 1, 2022, Pryde—acting without authority (though Plaintiffs allege no facts explaining how they know that to be true)—emailed ASG a document releasing ASG from its non-compete agreement with Bisley. *Id.* And in January 2023, after "Mackey/GTS" spent money

[1] In its prior Order [32], the Court noted that "[i]t is unclear from the allegations in the Amended Complaint [24] how exactly this was against each Plaintiff's interest." Ord. [32] at 4 n.1. Despite this notice from the Court, the allegations in the Second Amended Complaint [33] are identical in this regard to those in the Amended Complaint [23]. *Compare* Am. Compl. [23] at ¶¶ 50-52, *with* Second Am. Compl. [33] at ¶¶ 42-44.

expanding into Houston, Pryde allegedly informed Mackey that he was leaving Bisley to spend more time with his family. *Id.* at 9.

After Pryde resigned from Bisley, Plaintiff Buckley interviewed and accepted a job as Bisley's General Manager. *Id.* Buckley claims that ASG interviewed him for the Bisley position and represented that "ASG served as a contract sales and marketing arm of Bisley." *Id.* According to Plaintiffs, once Buckley was hired, ASG "attempted to persuade Buckley to purchase more silicate products for Bisley," even though Bisley already had "metric tons of the material" in GTS warehouses. *Id.* at 10. Then, ASG allegedly "offered to set up a separate income stream for Buckley by selling chemical products in the coatings and construction agency, through ASG," which Buckley, assertedly, rejected. *Id.* Plaintiffs claim that this is when they learned for the first time—despite Pryde's email on February 1, 2022, releasing ASG from the non-compete agreement—that ASG was competing with Bisley. *Id.*

Plaintiffs broadly allege that ASG and its employees were part of a conspiracy to undermine Bisley's business interests. *See id.* Plaintiffs say that ASG "began telling Buckley's customers that Bisley" was going out of business, *id.* at 11, that Bisley "requested confidential formulations and cost information from Buckley," *id.* at 12, and that Claudio Manissero and Jeff Koebrick, both representatives of ASG, "began 'poisoning the well' for Plaintiffs with Bisley's CEO," by claiming that "Buckley was not working or communicating with ASG," statements that Plaintiffs claim negatively impacted Buckley's employment relationship with Bisley, *id.*

Plaintiffs brought this suit in state court in August 2024, advancing eight claims against ASG and two individual defendants. *See* Compl. [1]. The case was removed to this Court on October 7, 2024. *See* Notice of Removal [1]. After granting in part and denying in part two Motions [5], [26] to Dismiss, *see* Ord. [21]; Ord. [32], the only remaining Defendant is ASG, and the only claims remaining are Plaintiffs' tortious interference with contract claims (Count I) and tortious interference with business relations claims (Count II), *see* SAC [33] at 13-18. Defendant now asks the Court to dismiss the Second Amended Complaint [33] under Federal Rule of Civil Procedure 12(b)(1) on grounds that each Plaintiff lacks standing. *See* Mem. [35] at 7. Alternatively, ASG seeks dismissal under Rule 12(b)(6) for failure to state a claim. *See id.*

## II. DISCUSSION

### A. Relevant Standards of Review

#### 1. Federal Rule of Civil Procedure 12(b)(1)

When faced with a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction,

> a trial court has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) (quotations omitted). "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of State of Qatar*, 313 F. Supp. 815, 819 (S.D. Tex. 2018) (citing

*Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). In considering a facial attack, the court "is required merely to look at the sufficiency of the allegations in the complaint because they are presumed to be true," *Paterson*, 644 F.2d at 523, but "[t]he party invoking federal jurisdiction bears the burden of establishing standing," *Crane*, 783 F.3d at 251. Because Defendant challenges the Court's subject-matter jurisdiction based solely on the pleadings, it is a facial attack.

2. Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (quotation marks omitted); *see also Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016). A claim must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The Court accepts all well-pleaded facts as true and views those facts in the light most favorable to the claimant, *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014) (citation omitted), but a claimant must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

B. Analysis

1. Defendant's Motion [34] to Dismiss Under Rule 12(b)(1)

Defendant contends that Plaintiffs lack Article III standing to pursue their claims because the purported harm they each suffered was derivative of the harm suffered by non-party Bisley. *See* Mem. [35] at 8. Standing is a threshold jurisdictional question, *see Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000), that "springs from the nature of limits of the judicial power of the United States and is inflexible and without exception," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quotations omitted) (cleaned up). To establish standing, a plaintiff must demonstrate:

> (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief.

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "Where, as here, a case is at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 338, 339 (2016) (alterations in original) (citation omitted). "Standing is assessed plaintiff by plaintiff and claim by claim." *League of United Latin Am. Citizens v. Abbott*, No. 1:21-cv-1006-RP-JES-JVB, 2022 WL 12097120, at *1 (W.D. Tex. Oct. 20, 2022) (citing *In re Gee*, 941 F.3d 153, 171 (5th Cir. 2019)).

An injury in fact must be "concrete, meaning that it must be real and not abstract," and "particularized," meaning that the injury "must affect 'the plaintiff in a personal and individual way.'" *All. for Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). Causation requires

the plaintiff to establish that their injury "likely was caused or likely will be caused by the defendant's conduct," *id.* at 382, meaning that an injury "must not be too speculative or too attenuated," *id.* at 383. Simply put, "to establish causation, the plaintiff must show a predictable chain of events leading from the [the defendant's] action to the asserted injury[.]" *Id.* at 385.

a. Plaintiff GTS

GTS's claim for tortious interference with contract is predicated on its contract with non-party Bisley, as well as leasing contracts with unidentified parties. According to Plaintiffs, GTS "had (and has) valid enforceable contracts with Bisley," including "for storage at the Hancock County Warehouse," SAC [33] at 13, and it "had (and has) valid and enforceable leases in Hancock County and Houston," *id.* They assert that "ASG has directly and negatively damaged Plaintiffs by attempting to drive their business partner, Bisley, out of business," *id.*, by intercepting and diverting sales leads, diverting business and inventory, and making "statements that intended (and did) cause clients to drop Plaintiffs," leading "Plaintiffs" to suffer financial harm, *id.* at 14.

GTS's alleged economic harm stemming from ASG's interference with the GTS and Bisley contract is individual to GTS and satisfies the injury in fact and causation elements of Article III standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."). And

typically, if a "defendant's action causes an injury . . . awarding damages for the action will" redress that injury. *All. for Hippocratic Med.*, 602 U.S. at 381.

Plaintiffs also claim that "Mackey and GTS" had a business relationship with "Bisley and Bisley's customers," such as Riteks and TMD Oilfield Technology. SAC [33] at 15, 16. They assert that ASG has damaged "Plaintiffs" by "attempting to drive their business partner, Bisley, out of business," and that "Mackey/GTS" were damaged by "lost income, from warehousing, transportation, and repackaging services." *Id.* at 16. These general factual allegations are sufficient to demonstrate GTS's Article III standing at the pleadings stage.

b. Plaintiffs Mackey and Buckley

Defendant argues that neither Mackey nor Buckley has standing because their purported injuries are derivative of the injuries suffered by non-party Bisley, and generally, courts "refuse to recognize standing based on economic harm that is merely a consequence of an injury suffered by another party." Mem. [35] at 14 (quoting *Duran v. City of Corpus Christi*, 240 F. App'x 639, 641 (5th Cir. 2007) (unpublished) (per curiam)). Plaintiffs dispute this characterization, arguing that "[t]hey allege direct interference with their own contracts, their own customer relationships, and their own revenue-generating operations." Resp. [39] at 11. Although Mackey and Buckley's claims lack clarity, both have generally alleged individual harm attributable to ASG, which would be remedied by receiving damages. This is sufficient to nudge both Mackey and Buckley over the threshold of standing.

2. Defendant's Motion [34] to Dismiss Under Rule 12(b)(6)

For the third time, ASG argues that the Second Amended Complaint [33] fails to state a claim and should be dismissed under Rule 12(b)(6). *See* Mem. [35]. Because their prior attempts were partially successful, *see* Ord. [21], [32], only two state-law claims remain: (1) tortious interference with contract; and (2) tortious interference with business relations, *see* SAC [33] at 13, 16.

a. Tortious Interference with Contract (Count I)

"An action for wrongful interference with contract will ordinarily lie when a defendant maliciously interferes with a valid and enforceable contract, thereby causing one party not to perform and resulting in injury to the other contracting party." *Gulf Coast Hospice, LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 745 (Miss. 2019) (quoting *Cenac v. Murry*, 609 So. 2d 1257, 1268 (Miss. 1992)). The elements of tortious interference with contract are:

> (1) that the acts [of the defendant] were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); (4) that actual damage and loss resulted.

*Id.* (quoting *Cenac*, 609 So. 2d at 1268-69); *see also Rimmer v. Hancock Cnty.*, 757 F. Supp. 3d 684, 693 (S.D. Miss. 2024). "In addition to establishing those four elements, a plaintiff in a tortious-interference-with-contract claim 'must prove that an enforceable obligation existed between the plaintiff and another party' and 'that the contract would have been performed but for the alleged interference.'" *Sun State Oil, Inc. v. Pahwa*, No. 3:18-cv-619-DPJ-FKB, 2019 WL 138650, at *3 (S.D.

Miss. Jan. 8, 2019) (quoting *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998)).

ASG argues that "Plaintiffs have not identified any breaches by any third parties purportedly induced by ASG," Mem. [35] at 17, and that "[a]ll of the alleged harm suffered by Plaintiffs due to ASG's purported interference with Bisley are downstream of the purported breaches of ASG's contract with Bisley, which none of the Plaintiffs are a party to or have a right to enforce," *id.* Plaintiffs respond by claiming that they have alleged every element of their claim and that Defendant is attempting to "impose a level of factual detail and proof that is not required at this stage of the litigation." Resp. [39] at 16.

(i) Plaintiff GTS

As to the first element, Plaintiffs allege that "GTS had (and has) valid enforceable contracts with Bisley," including for "storage at the Hancock County Warehouse," SAC [33] at 13, and that GTS, through Mackey, agreed to "perform trucking and other services" for "ASG/Bisley," *id.*; *see also* Resp. [39] at 13. Plaintiffs claim that ASG intentionally interfered with these contracts, by attempting to "drive their business partner, Bisley, out of business," SAC [33] at 13, by intercepting and diverting leads, by diverting business and inventory, and by making false statements to customers, *id.* at 14; Resp. [39] at 14. According to Plaintiffs, ASG also "moved all its inventory (and Bisley's) out of GTS's Hancock County Warehouse, and Houston," SAC [33] at 12, thereby "eliminating the very business activity underlying Plaintiffs' contracts," Resp. [39] at 14. This conduct—

says GTS—was intended to and did cause damage to GTS, manifesting in the form of lost revenue and income. *See* SAC [33] at 14.

Although GTS's allegations would benefit from additional clarity—as Defendant notes, there are inconsistencies in Plaintiffs' allegations, *see, e.g.,* Reply [42] at 3-4,—these allegations suffice for now as to GTS. But this victory may prove to be a Pyrrhic one if, under Rule 56, Plaintiffs fail to produce *evidence* showing: (1) a contract; (2) a party's breach; and (3) that but-for ASG's conduct, the breach would not have occurred. *See, e.g., Brown v. Cooper Tire & Rubber Co.*, No. 1:13-cv-00176-SA-JMV, 2015 WL 4477564, at *5 (N.D. Miss. July 22, 2015) ("Brown must also show that he and Cooper Tire shared an enforceable obligation that would have been performed if not for the alleged interference by T.K. Group.").

(ii) Plaintiff Mackey

Mackey's claim for tortious interference with contract should be dismissed because, despite being afforded multiple opportunities to do so by the Court, he has failed to allege the existence of a valid or enforceable contract between himself and any third-party. The Second Amended Complaint [33] asserts that "Mackey also agreed *for GTS* to perform trucking and other services at the Hancock County Warehouse for ASG/Bisley," that ASG interfered with "Plaintiffs' contracts," and that "ASG repeatedly attempted to convince Plaintiffs GTS and Mackey to violate the GTS-Bisley contract[.]" SAC [33] at 13, 14 (emphasis added). Completely absent are any facts alleging that Mackey himself was a party to any contract, nor are Plaintiffs' conclusory and shotgun allegations that ASG interfered with

"Plaintiffs' contracts" sufficient. *Id.* at 13; *see Gulf Coast Hospice, LLC*, 273 So. 3d at 745 (explaining that tortious interference with contract requires a valid and enforceable contract). Plaintiff Mackey's tortious interference with contract claim should be dismissed.

(iii) Plaintiff Buckley

As best the Court can discern from Plaintiffs' pleadings, the operative contract for Buckley's claim is apparently his employment contract with non-party Bisley. Buckley has generally alleged an interference with contract claim, but he has not specifically pled an interference with *employment* claim despite being afforded multiple opportunities to do so. SAC [33] at 2, 12, 13. But construing their broad allegations as an effort to state such a claim, Plaintiffs contend that "Buckley had a valid and enforceable employment agreement with Bisley," *id.* at 13, and that "ASG has directly and negatively damaged Plaintiffs by attempting to drive their business partner, Bisley out of business," *id.* But Buckley was not Bisley's business partner; he was its employee. *See id.* at 1.

Plaintiffs claim that "ASG interfered with Plaintiffs' contracts as they diverted business and inventory and made statements that intended [sic] [to] (and did) cause clients to drop Plaintiffs," *id.* at 14, but there are only brief statements in the Second Amended Complaint [33] relating to Buckley himself. Plaintiffs assert that "ASG has alleged that Buckley has a history of stealing business from his customers." *Id.* at 13. But Plaintiffs do not identify who made those statements, who heard them, or when they occurred. And such a broad and vague assertion is

not enough for that statement to plausibly allege tortious interference with contract. *See Twombly*, 550 U.S. at 555.

Regarding Buckley specifically, Plaintiffs also claim that

> Manissero and Koebrick began "poisoning the well" for Plaintiffs with Bisley's CEO. For example, ASG claimed that Buckley was not working or communicating with ASG. These statements and actions by ASG to Bisley's CEO and others negatively impacted Buckley's employment relationship with Bisley . . . ASG's acts, omissions, and misrepresentations have also led to decreased commissions to Buckley.

SAC [33] at 12, 14. While lacking in detail, these statements do plausibly allege intentional statements by ASG calculated to cause interference with Buckley's employment with Bisley, resulting in lost commissions to Buckley. Buckley should have more specifically pled a separate tortious interference with employment claim to disaggregate his harms from those of the other Plaintiffs, but the Court reads these assertions regarding Buckley's harms as sufficient at this stage to state a claim for tortious interference with his employment contract.

b. Tortious Interference with Business Relations (Count II)

"Tortious interference with business relations . . . occurs when one unlawfully diverts prospective customers away from another's business." *Badr v. Jackson HMA, LLC*, No. 3:20-cv-192-DPJ-FKB, 2021 WL 10917431, at *2 (S.D. Miss. Nov. 5, 2021) (quoting *McBride Consulting Serv., LLC v. Waste Mgmt. of Miss., Inc.*, 949 So. 2d 52, 55 (Miss. Ct. App. 2006)). Although distinct from a tortious interference with contract claim, s*ee Gulf Coast Hospice LLC*, 273 So. 3d at 745, in Mississippi, tortious interference with business relations claims share the same elements, *see Badr*, 2021 WL 10917431, at *2 (collecting cases). Relevant here is the general

principle that the cause of action for this tort belongs only to parties to the business relationship, which does not include a proper party's employees. *See* Restatement (Second) of Torts § 766 cmt. p ("The person protected by the rule . . . is the specified person with whom the third person had a contract that the actor caused him to perform . . . Thus, if A induces B to break a contract with C, persons other than C who may be harmed by the action as, for example, his employees or suppliers, are not within the scope of the protection afforded by this rule, unless A intends to affect them."); *see also Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 540 (D. Md. 2006) (applying Restatement (Second) of Torts § 766 cmt. p to "economic relationship[s]" (i.e., business relations)).

(i) Plaintiff GTS

Plaintiffs claim that GTS has a "business relationship[] with Bisley and Bisley's customers," and that "[s]ome of Bisley's customers . . . are also Mackey/GTS customers." SAC [33] at 15. They further assert that "ASG has tortiously interfered with Plaintiffs' business relations" by "attempting to drive Bisley out of business" by intercepting and diverting "leads for future sales of products that are the same or like the Bisley products listed in their agreements," causing "Bisley to pay inflated commission rates." *Id.* at 16. According to Plaintiffs, ASG interfered with "Plaintiffs' business relations with Riteks" because ASG "made sales to Riteks," causing "GTS/Mackey" to lose income from warehousing, transportation, and repackaging services. *Id.* Plaintiffs repeat these allegations with respect to non-party TMD. *See id.* at 17. They also contend that ASG "attempted to convince

Plaintiffs GTS and Mackey to violate the GTS-Bisley contract and harm its own business relationship with Bisley," and that "ASG coordinated targeted theft of inventory" and "blames Plaintiffs GTS and Mackey for that theft, intended to damage Plaintiffs GTS and Mackey's professional reputation and business relationships." *Id.* at 18.

Despite the shotgun nature of many of the foregoing allegations, on the whole the record plausibly asserts that GTS had a business relationship with Bisley. GTS has alleged that ASG intentionally engaged in activity intended to harm its relationship with other third parties by diverting sales leads, by attempting to convince it to violate another contract, and by blaming GTS for theft in an apparent effort to divert customers away from GTS. *See id.* And all of this allegedly resulted in economic harm. *See id.* At this stage, GTS's allegations are sufficient, *see Monroe's Donuts & Bakery v. Sweet Sensations Bakery, LLC*, No. 3:10-cv-664TSL-MTP, 2011 WL 3876953, at *2 (S.D. Miss. Sept. 1, 2011) ("Sweet Sensations has sufficiently pled—albeit with the bare minimum of factual elucidation—claims . . . for tortious interference with business relations."), and GTS has raised "a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)," *Twombly*, 550 U.S. at 555.

(ii) Plaintiff Mackey

Mackey has not alleged sufficient facts to support his tortious interference with business relations claim. The Second Amended Complaint [33] asserts that "Plaintiffs Mackey and GTS each have business relationships with Bisley and

Bisley's customers" and that "[s]ome of Bisley's customers . . . are also Mackey/GTS customers." SAC [33] at 15. But Plaintiffs have not pled any facts showing that Mackey himself maintained any independent business relationship with any third party or what the nature of any such business relationship may have been. Rather, Mackey worked on behalf of GTS as its Chief Executive Officer. *See id.* at 1. And the pleadings simply combine Mackey with GTS as Plaintiffs and offer a conclusory recitation of the elements of their cause of action. *See, e.g.*, *id.* at 16 ("Plaintiffs Mackey/GTS were damaged . . ."); *id.* at 17 ("ASG had knowledge of GTS and Mackey's business relations . . ."); *id.* ("ASG interfered with and diverted Plaintiffs GTS and Mackey's business and business leads . . ."); *id.* at 18 ("ASG sabotaged Plaintiffs GTS and Mackey's business relationships . . . by falsely representing that Plaintiffs engaged in theft."). Section 766 of the Restatement (Second) of Torts, as explained by comment p, bars Mackey, as an employee, from transforming GTS's business interference claim into his own additional claim. Were it otherwise, potentially every employee of GTS would have a tortious interference with business relations claim against ASG. The business relationship belonged to GTS, and Mackey has identified no separate, independent relationship he shared with any third party.

Plaintiffs have been repeatedly warned by the Court about the shotgun nature of many, if not most, of their allegations but have continued to assert them. At this point, after repeated admonishments, Mackey's unsupported and shotgun

allegations that he shared some undefined business relationship with unidentified parties are insufficient, and his claim should be dismissed.

(iii) Plaintiff Buckley

Plaintiffs allege that:

> Plaintiffs Mackey and GTS each have business relationships with Bisley and Bisley's customers (and former customers, in some cases).
>
> Some of Bisley's customers (and former customers) are also Mackey/GTS customers (or former customers, due to ASG).
>
> All of Bisley's North American customers are also Buckley's customers (or former customers, due to ASG).

SAC [33] at 15. Plaintiffs then contend that ASG has "tortiously interfered with Plaintiffs' business relations with Riteks" because, beginning in 2022, "ASG made sales to Riteks resulting in $1,948,910.02 in lost sales to Bisley," *id.* at 16, and therefore "Plaintiff Buckley lost commission and bonus from $1,948,910.02 in lost sales to ASG," *id.* Plaintiffs repeat these allegations with respect to TMD, claiming that, also beginning in 2022, "ASG made sales to TMD" resulting in "approximately $1.4 million in lost sales to Bisley" and lost commission to Buckley. *Id.* at 17.

Buckley has failed to allege a business relationship that is actionable apart from his employment with Bisley. Buckley was the General Manager of Bisley, *id.* at 1, and he has raised a separate tortious interference with contract claim, *id.* at 14-15. Simply alleging that "[a]ll of Bisley's North American customers are also Buckley's customers," *id.* at 15, without further factual support, is insufficient and ignores corporate formalities; it is well-established that mere "labels and conclusions" will not do, *Twombly*, 550 U.S. at 555. The customers were Bisley's,

not Buckley's as an employee. Buckley does not allege that he had a separate business arrangement with Riteks or TMD, or that he personally provided services to them. Nor does he allege that he had a separate business relationship with them in his individual capacity. *See* SAC [33] at 17, 18. Rather, Buckley simply asserts that Bisley made sales to Riteks and TMD, and because "all" Bisley customers were, somehow, transformed into his customers, ASG interfered with his business relationships when it made direct sales to those parties. This is insufficient to plead the existence of an actionable business relationship.

As the Court previously discussed with respect to Plaintiff Mackey, if employees could recast an instance of tortious interference with business relations suffered by their employers into their own personal cause of action simply because they were employed by the injured business, every person employed by that business could sue. Nor does the fact that Buckley received commission payments establish an independent business relationship because those payments "were derivative of a contract between [Bisley] and [the other parties]," and Buckley "simply had no independent business relationship with which [ASG] could have interfered." *Ward v. Life Invs. Ins. Co. of Am.*, 383 F. Supp. 2d 882, 889 (S.D. Miss. 2005). Moreover, Buckley has not alleged that his prospective lost commission payments were the product of *tortious* interference. As Plaintiffs themselves have alleged, Bisley released ASG from its non-compete agreement in February 2022, SAC [33] at 8, and Buckley's lost commissions were the downstream result of sales made by ASG to Bisley's prospective customers, *id.* at 16-17. But absent any non-

compete agreement, that is simply routine business competition, not tortious interference designed to injure Buckley.

Because Plaintiffs have not sufficient pled facts supporting the existence of an independent business relationship between Buckley and any other party, he has failed to state a claim.

## III. CONCLUSION

To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant ASG Chemical Holdings, LLC's Motion [34] to Dismiss is **GRANTED IN PART**, and all of Plaintiff Gary Mackey's claims and Plaintiff William Buckley's claim for tortious interference with business relations are **DISMISSED WITH PREJUDICE** for failure to state a claim. Defendant's Motion [34] is **DENIED IN PART** with respect to Plaintiff Goodnight Terminal Services, Inc.'s claims for tortious interference with contract and tortious interference with business relations, and Plaintiff William Buckley's claim for tortious interference with contract, and those claims will proceed.

**SO ORDERED AND ADJUDGED**, this the 9th day of September, 2026.

s/ Halil Suleyman Ozerden

HALIL SULEYMAN OZERDEN
CHIEF UNITED STATES DISTRICT JUDGE